IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|                              |   |                          |
|------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA     | * |                          |
|                              | * |                          |
| v.                           | * | CRIMINAL NO.:  WDQ-14-0116 |
|                              | * |                          |
| MASTER GIDDINS               | * |                          |
|                              | * |                          |

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

Master Giddins is charged with bank robbery and conspiracy to commit bank robbery.  ECF No. 1.  Pending are Giddins's motions: (1) to suppress custodial statements (ECF No. 14), and (2) to suppress historical cell site location data (ECF No. 20). A hearing was held on September 29, 2014.  For the following reasons, Giddins's motions will be denied.

I.   Background

A.   Facts[1]

1.   The Crimes and Arrest

On September 25, 2013, someone entered the M&T Bank at 329 W. Baltimore Street, Baltimore City, Maryland wearing women's clothing and a black wig.  ECF No. 19 at 1.  That person handed

---

[1] By agreement of the parties, the facts are taken from the government's opposition, supplement to its opposition, and supporting exhibits, ECF Nos. 19, 23, 33, Giddins's reply, ECF No. 32, the recorded video interview submitted by the government, ECF No. 19-1, and the transcript of that interview.

the teller a note stating he had a bomb, and demanded money be placed into a black and white polka dot cosmetic bag he handed to the teller. *Id.* The teller placed cash and a GPS tracking device into the cosmetic bag and handed it back to the robber. *Id.* at 1-2. The robber fled the bank and discarded the tracking device. *Id.* at 2. Police recovered the tracking device on Baltimore Street. *Id.* Though it had been run over, police recovered wig fibers from the tracking device. *Id.* Czekiah Fludd, an unindicted coconspirator, was the getaway driver, and she drove Giddins's Ford Focus automobile from the scene. *Id.*

On September 26, 2013, Giddins lent his Ford Focus to Fludd and another female, Ashley Fitz, which they used to rob the 1st Mariner Bank at 4800 Painters Mill Road, Owing Mills, Maryland. *Id.* Before entering the bank, Fludd drove the Ford Focus to an Exxon station near the bank and obtained blank lottery tickets. *Id.* Fludd and/or Fitz wrote a note similar to the note used in the September 25 robbery on a ticket. *Id.* Fitz went into the bank wearing the black wig and using the black and white polka dot cosmetic bag that had been used in the September 25 robbery; she handed the bag to the teller with the note. *Id.* The teller gave cash to Fitz, who then ran from the bank. *Id.* A nearby construction worker saw Fitz and Fludd get into Giddins's Ford Focus. *Id.* They were also recorded on video at the Exxon station where Fludd obtained the blank lottery tickets. *Id.*

2

Proceeds from the robbery were allegedly split between Fitz, Fludd, and Giddins. *Id.*

On September 27, 2013, Giddins again lent his automobile to Fitz and Fludd, and another female co-conspirator Alexis Chandler. *Id.* Fludd drove Fitz and Chandler to the Baltimore County Savings Bank, 515 Eastern Avenue, Baltimore County, Maryland. *Id.* Fitz and Chandler, wearing wigs, entered the bank, produced notes saying they had a bomb, and demanded money. *Id.* The tellers provided them with cash, and Fitz was given a dye pack. *Id.* at 2-3. Fitz and Chandler left the bank and got into the Ford Focus driven by Fludd. *Id.* at 3. The dye pack exploded, and Fitz threw the handbag with the exploded dye pack out the car window. *Id.* The wigs and some other items were also discarded. *Id.* Police stopped the car after receiving a broadcast description of the suspects and the silver Ford Focus. *Id.* Police recovered evidence from the car and the scene. *Id.*

Fitz and Chandler provided statements to investigators after being advised of their rights. *Id.* Fitz and Chandler admitted the robberies and their involvement. *Id.* All three banks were FDIC insured. *Id.* An arrest warrant was issued for Giddins. ECF No. 32 at 2.

    2.   Giddins's Statement

On October 4, 2013, Giddins went to Baltimore County police headquarters to obtain his car. ECF No. 19 at 3. Officers

placed Giddins in an interrogation room.  *Id*.  Giddins asked

Detective Morano, "Am I in trouble?" and Detective Morano

replied, "No, you're here getting your car, right?"  ECF No. 32

at 2; Interview Tr. at 3.  Detective Morano left the room.  ECF

No. 32 at 2.

A few minutes later, Detective Taylor entered the interview

room.  *Id*.[2]  Apparently believing he was going through the

process to obtain his car, Giddins answered questions, including

his name and nickname, address, employment, cellphone number,

date of birth, height and weight, whether he wore glasses,[3] and

social security number.  ECF No. 19 at 3; Interview Tr. at 3-8.

At 10:28:15 (on the recorded video interview), Detective

Taylor told Giddins that before the police could return his car,

they had to explain his rights.  ECF No. 32 at 3.  Detective

Taylor stated:

> [O]bviously your car was used in a crime which sucks
> for you since it puts you in the middle of stuff . . .
> we are going to ask you some things about your car,
> but legally, since it is your car, before we speak to
> you about it we have to read you your rights, it
> doesn't mean you're under arrest, it doesn't mean
> you're being charged with anything.  This is, we are
> asking you questions, by law we have to read you your
> rights.

---

[2] Another officer joined Detective Taylor but did not ask
questions.  ECF No. 19-1.

[3] Giddins responded that he wore contacts, and answered "yes" in
response to whether he was wearing them.  Interview Tr. at 5-6.

4

ECF Nos. 33 at 3, 32 at 3; Interview Tr. at 8-9.  Giddins read aloud from the *Miranda* waiver and stated that he understood his rights.  Interview Tr. at 9.  When asked if he had any questions, the following exchange occurred:

| | |
|---|---|
| Det. Taylor: | You don't have any questions about us asking about your car, do you? |
| Giddins: | Yes.  Is this the procedure for getting my car back?  Cause I feel like . . . . |
| Taylor: | Yeah, we do, but like I said, your car was used in crimes, that we need to dig in and find out what's going on with your, with these three girls, what your relationship with them is, how they came in contact with your car, all that stuff.  Understand that? |
| Giddins: | I understand that. |
| Taylor: | OK. . . . Do you mind explaining all that stuff to us? |
| Giddins: | I don't know any of that stuff. |
| Taylor: | Well we don't know that until I ask you, right? |
| Giddins: | Right, but I just told you.  That's what I'm asking, like.  Is this the procedure to get my car back? |
| Taylor: | Yes, in order for us to ask you questions because the vehicle was used in a crime, by law we have to go over these rights. |
| Giddins: | Right. |
| Taylor: | If we start asking you stuff and you don't want to talk to us, then don't talk to us.  But we're just trying to |

<div style="margin-left: 3em;">

figure out some issues.

Giddins:      But I still get my car?

Taylor:       Before I release the car to you I would
              like to know some answers.  I would like
              to know some answers before we release
              your car back.

Giddins:      That's what I'm asking.  I'm not in
              trouble or anything, am I?

Taylor:       Not at this point, no.  We'll find out
              what's going on.  So long as you don't .
              . . sit there and tell me you were
              hiding in the trunk and you escaped when
              the police pulled them over, no.

</div>

Interview Tr. at 9-11.

At 10:31, Giddins told the detectives that he thought he was being "interrogated." He observed that he was "in a closed room, two guys are here, they locked the door . . . ." ECF No. 32 at 4; Interview Tr. at 11. The recorded video interview shows Detective Taylor stated that one of the two interview doors was "wide open." ECF No. 19-1; *see also* Interview Tr. at 11. Giddins was not handcuffed. *Id.* No weapons are visible in the recorded interview. *Id.* Detective Taylor's tone was nonthreatening. *Id.* At 10:32:10, Giddins signed the waiver of rights. ECF No. 32 at 4.

Detective Taylor questioned Giddins about his "relationship with the three young women, his loaning of the car to them, his work schedule, and other topics relating to the bank robberies." *Id.* Then, Detective Taylor showed Giddins a surveillance

photograph and told him he was a suspect in the bank robberies.
ECF No. 32 at 4.  Giddins asked for a lawyer; questioning
stopped, and Giddins was arrested.  ECF Nos. 19 at 3, 19-1.
After his arrest, Giddins's cellphone and other items in his
pockets were seized.  ECF No. 19-1.  The cellphone was locked,
and police officers did not search the contents of the
cellphone.  ECF No. 19 at 5.

     3.    Cellphone Location Data

During the October 4, 2013 interview described above,
Giddins provided the investigator with his cellphone number.
ECF No. 23 at 3.  On December 20, 2013, agents applied for a
court order under 18 U.S.C. § 2703(d)(2012) for subscriber
information, historical call records, and historical GPS/cell
site information.  *Id.*; *see also* ECF No. 23-1.[4]  On that same

---

[4] The government's application stated that surveillance
photographs taken during the September 25, 2013 M&T Bank robbery
"strongly resemble[d]" Giddins.  ECF No. 23-1 ¶ 4.  The
application described the September 26, 2013 robbery of the 1st
Mariner Bank, which involved a female suspect "wearing the same
or similar wig as utilized in the September 25 robbery," and
utilizing an identical polka dot bag.  *Id.* ¶ 5.  The application
also described the police apprehension of Fitz, Chandler, and
Fludd after the September 27, 2013 Baltimore County Savings Bank
robbery; Fludd was driving a silver Ford Focus registered to
Giddins.  *Id.* ¶ 6.  Officers recovered "several long dark wigs
and a man's dark green sweater" matching the sweater Giddins
allegedly wore during the September 25 robbery.  After being
advised of their *Miranda* rights, Fitz and Chandler waived their
rights and admitted to their participation in the robberies.
*Id.* ¶ 7.  Chandler implicated Giddins in the September 25, 2013
robbery and stated that Giddins was Fitz's boyfriend and had a
relationship with Fludd.  *Id.*

date, U.S. Magistrate Judge Susan K. Gauvey approved the Order.
*Id.* at 9.[5]  Data obtained from Sprint Spectrum ("Sprint")
indicated that Giddins's cellphone communicated with two cell
towers located near the M&T Bank on September 25, 2013.  ECF No.
23 at 4.[6]

---

The Order issued on the basis of the above facts stated
that the government had provided "specific and articulable facts
showing that there are reasonable grounds to believe that the .
. . records . . . sought, are relevant and material to an
ongoing criminal investigation."  ECF No. 23-1 at 6; *see also* 18
U.S.C. § 2703(d).  However, the facts stated in the application
arguably provided "probable cause to believe that the
information to be obtained [was] evidence of a crime."  *In re
Application of U.S. for an Order Authorizing Disclosure of
Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d
526, 560 (D. Md. 2011) (*quoting Electronic Communication Privacy
Act Reform: Hearing Before the Subcomm. on the Constitution,
Civil Rights, and Civil Liberties of the H. Comm. on the
Judiciary*, 111th Cong. 39-40 (2010) (statement of Orin Kerr,
Professor, George Washington Univ. Law School)).

"Probable cause is a flexible standard that simply requires
'a reasonable ground for belief . . .' and 'more than bare
suspicion.'"  *United States v. Ortiz*, 669 F.3d 439, 444 (4th
Cir. 2012) (*quoting Brinegar v. United States*, 338 U.S. 160, 175
(1949)).  The resemblance between Giddins and the surveillance
photograph, the matching wig, sweater, and polka dot bag, and
Chandler's statements gave officers "more than bare suspicion"
that Giddins was involved in the robberies and that his
cellphone location data would provide evidence of his alleged
involvement.  Thus, officers likely had sufficient grounds for
obtaining Giddins's cellphone location data under 18 U.S.C.
§ 2703(c)(1)(a) (pursuant to a warrant) as well as under 18
U.S.C. § 2703(d) (pursuant to a court order).

[5] The Order required Sprint Spectrum ("Sprint") to provide
subscriber information, historical local and long-distance call
records, and historical GPS/cell site information for Giddins's
cellphone from September 1-30, 2013.  ECF No. 23-1 at 6-7.

[6] According to Giddins, the government gathered data on more than
2600 cellphone calls over the course of the month.  ECF No. 20

B.    Procedural History

On March 12, 2014, Giddins was indicted on three counts of bank robbery in violation of 18 U.S.C. § 2113(a),(f)(2012),[7] and one count of conspiracy to commit bank robbery in violation of

---

¶ 3.   The data covered unanswered and answered inbound calls, outbound calls, and inbound and outbound text messages.  *Id*. ¶ 2.   Data for the calls sometimes show a single cell site (indicating a stationary call), and sometimes different sites (indicating movement during the call).  *Id*.  According to the government, Giddins "voluntarily transmit[ted] a signal to a cell tower for his call to be connected, and the provider thereby create[d] a record[ ] . . . regarding which of its cell towers it used to complete the call."  ECF No. 23 at 6.  The government mapped calls using the longitude and latitude of each site to track and locate Giddins's cellphone at specific times. *Id*.  The government stated that the records do not reflect the content of any conversation or the cellphone's specific location.  ECF No. 23 at 4.

[7] Under § 2113(a),
    [w]hoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association[,] . . . [s]hall be fined under this title or imprisoned not more than twenty years, or both.
18 U.S.C. § 2113(a).  Section 2113(f) defines "bank" as:
    any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, . . . and any institution the deposits of which are insured by the Federal Deposit Insurance Corporation.
*Id*. § 2113(f).

18 U.S.C. § 371(2012).[8]   ECF No. 1 at 1-6.   On March 13, 2014,
Giddins was arraigned and pled not guilty.   ECF No. 5.

On April 8, 2014, Giddins moved to suppress custodial
statements.   ECF No. 14.   On August 4, 2014, Giddins moved to
suppress historical cell site location data and its fruits.   ECF
No. 20.   On August 1, 2014, the government opposed Giddins's
motion to suppress statements.   ECF No. 19.   On August 7, 2014,
the government opposed Giddins's motion to suppress historical
cell site location data.   ECF No. 23.   On September 24, 2014,
Giddins replied to the government's opposition to his motion to
suppress statements.   ECF No. 32.   On September 25, 2014, the
government supplemented its opposition to Giddins's motion to
suppress statements.   ECF No. 33.[9]

---

[8] Under § 371,

> [i]f two or more persons conspire either to commit any
> offense against the United States, or to defraud the
> United States, or any agency thereof in any manner or
> for any purpose, and one or more of such persons do any
> act to effect the object of the conspiracy, each shall
> be fined under this title or imprisoned not more than
> five years, or both.

18 U.S.C. § 371.

[9] On September 24, 2014, Giddins withdrew his motion to suppress
tangible and derivative evidence, ECF No. 18.   *See* ECF No. 32.

II.  Analysis

    A.  Motion to Suppress Statements

        1.  Fifth Amendment/*Miranda v. Arizona*

Giddins contends that his statements were obtained in violation of the Fifth and Sixth Amendments to the United States Constitution, and were involuntary.  ECF No. 14 ¶¶ 3-5.  Giddins argues that the police lied to him about his custodial status and deceived him into thinking "the information they sought would be used only in connection with the return of the car and that he was not in any trouble."  ECF No. 32 at 4.  The government contends that Giddins's statements before he waived his rights are admissible because he was not in custody, and alternatively, that because they were routine "booking questions," they did not require *Miranda* warnings.  ECF No. 19 at 3-4.  The government further contends that Giddins voluntarily waived his *Miranda* rights.  *Id*. at 4-5.

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), requires the police to inform a suspect that he has the right to remain silent and the right to the presence of an attorney before any "custodial interrogation."  *See Miranda*, 384 U.S. at 479, 86 S.Ct. 1602.

A suspect is "'in custody' for *Miranda* purposes either if he has been arrested or if his freedom of action has been curtailed to a degree associated with arrest."  *United States v.*

11

*Pope*, 212 F. App'x 214, 218 (4th Cir. 2007) (*quoting United States v. Sullivan*, 138 F. 3d 126, 130 (4th Cir. 1998)).  The inquiry is objective, "and asks whether a reasonable man in the suspect's position would have understood his situation to be one of custody"; in other words, whether the suspect felt free to leave.  *United States v. Hashime*, 734 F.3d 278, 282-83 (4th Cir. 2013) (internal quotation marks omitted); *see also J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011).  Relevant factors include the time, place, and manner of the interrogation; isolation from family; an officer's words, tone, and demeanor; the presence of multiple officers; whether a weapon was displayed; and whether physical contact occurred between the officer and the suspect.  *Hashime*, 734 F.3d at 283.

When a suspect in custody has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L.Ed.2d 378 (1981).

However, "routine booking question[s]" securing "the biographical data necessary to complete booking or pretrial services" are exempt from *Miranda*.  *Pennsylvania v. Muniz*, 496 U.S. 582, 601, (1990) (internal quotation marks omitted) (name, address, height, weight, eye color, date of birth, and current

age admissible without *Miranda* warnings); *United States v.
D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994).  The exception does
not apply to routine booking questions intended to elicit
incriminating statements.  *D'Anjou*, 16 F.3d at 608.  Routine
booking questions obtaining identifying information that *later*
proves incriminating are exempt.  *United States v. Taylor*, 799
F.2d 126, 128 (4th Cir. 1986) (suspect's provision of a false
name and alias after he invoked his *Miranda* rights admissible to
disprove alibi).

A waiver of *Miranda* rights must be voluntary, knowing, and
intelligent. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct.
1135, 89 L.Ed.2d 410 (1986).  A waiver is voluntary, knowing,
and intelligent if it was "the product of a free and deliberate
choice rather than intimidation, coercion, or deception," and if
it was "made with a full awareness of both the nature of the
right being abandoned and the consequences of the decision to
abandon it." *Id.*; *see also United States v. Cristobal*, 293 F.3d
134, 138-40 (4th Cir. 2002) (suspect validly waived his *Miranda*
rights when officers interrogated him in hospital the day after
being shot multiple times by police).  Express written or oral
waiver of *Miranda* rights is strong proof of the waiver's
validity.  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

The Court engages "in the same inquiry when analyzing the
voluntariness of a *Miranda* waiver as when analyzing the

13

voluntariness of statements under the Due Process Clause,"
*Cristobal*, 293 F.3d at 140.  The test for determining
voluntariness "is whether the confession was 'extracted by any
sort of threats or violence, [or] obtained by any direct or
implied promises, however slight, [or] by the exertion of any
improper influence.'"  *United States v. Braxton*, 112 F.3d 777,
780 (4th Cir. 1997) (*quoting Hutto v. Ross*, 429 U.S. 28, 30
(1976) (alterations in original)).  "The mere existence of
threats, violence, implied promises, improper influence, or
other coercive police activity, however, does not automatically
render a confession involuntary."  *Id*.  The Court must ask
whether "the defendant's will has been overborne or his capacity
for self-determination critically impaired because of coercive
police conduct."  *Id*.

Police deception, standing alone, does not render a
suspect's statements involuntary.  *See Frazier v. Cupp*, 394 U.S.
731, 737 (1969) (officer's misrepresentation that suspect's
companion had confessed did not render confession inadmissible);
*United States v. Haynes*, 26 F. App'x 123, 134 (4th Cir. 2001)
(unpublished) (confession voluntary when officers lied to
suspect about the evidence they had obtained during 16-hour
interrogation).[10]  Police are not required to advise suspects of

---

[10] *See also Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir.
1992) ("Of the numerous varieties of police trickery, however, a

the nature of the offense for which he is being questioned. *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998).

Here, before providing *Miranda* warnings, Detective Taylor only asked Giddins routine, booking-type questions, ECF No. 19 at 3; Interview Tr. at 3-8, that did not require warnings. Thus, Giddins's pre-warning statements are admissible.

Further, Giddins voluntarily entered the police station to obtain the return of his car. ECF No. 19 at 3. Giddins was not in handcuffs, and one door was unlocked. ECF No. 19-1. Two investigators were present; one asked questions while the other remained silent. *Id*. No weapons are visible in the recorded interview. *Id*. Detective Taylor's tone was nonthreatening. *Id*. Although an arrest warrant had issued, ECF No. 32 at 2, Giddins was apparently unaware of this fact and, thus, it does not alter the objective inquiry.[11] That Giddins may have believed that terminating the interview would prevent the return

---

lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary."). *Cf. Brewer v. Williams, 430 U.S. 387*, 402 (1977). In *Williams*, the Court stated that waiver was not solely a question of fact, but a mixed question of fact and law. *Id*. at 397, n.4, 402. In *Fields v. Murray*, 49 F.3d 1024, 1032 (4th Cir. 1995), the Fourth Circuit held that waiver of the right to counsel was a question of fact.

[11] Had Giddins been aware that the arrest warrant had issued, then "a reasonable man in the suspect's position would have understood" that he was not free to leave. *Hashime*, 734 F.3d at 282-83. That is not the case here.

of his car does not mean that Giddins felt unfree to leave. Accordingly, Giddins was not in custody before his arrest, and his pre-warning statements are admissible.

Giddins's waiver of his *Miranda* rights was voluntary. He read his rights aloud, signed his name and initials, and responded that he understood his rights. Interview Tr. at 9. That Giddins waived his rights under the apparent belief it would aid in the return of his car was not the police coercion necessary to overbear Giddins's will or seriously impair his capacity for self-determination.[12] *See Cristobal*, 293 F.3d at 140.[13] When Giddins requested counsel, questioning ceased. ECF No. 19 at 3.

---

[12] When Detective Taylor stated that because "your car was used in crimes, [w]e need to dig in and find out what's going on with your, with these three girls. What your relationship with them is, how they came in contact with your car, all that stuff. Understand that?," Giddins responded, "I understand that." ECF No. 32 at 3; Interview Tr. at 10. Thus, Giddins apparently believed that he was there to answer questions to obtain his car and, on that basis, voluntarily waived his rights.

[13] To support his contention that his *Miranda* waiver was invalid, Giddins cites *United States v. Lall*, 607 F.3d 1277, 1282-83 (11th Cir. 2010) and *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991). In *Lall*, the detective provided the defendant with *Miranda* warnings and then told the defendant he would not pursue charges against him. 607 F.3d at 1283. The Court found the defendant's waiver involuntary, though in doing so it cited other factors, including that police told the defendant the questioning would protect his family from harm. *Id*. at 1284. In *Beale*, the defendant signed the *Miranda* waiver "only after an agent told him that signing the form would not hurt him." 921 F.2d at 123. The Court found the defendant's waiver involuntary because the agent "contradicted the *Miranda* warning that a

Accordingly, Giddins voluntarily waived his *Miranda* rights and, thus, his post-warning statements are admissible.

    2.    Sixth Amendment Right to Counsel

In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to counsel "attaches only at or after the initiation of adversary judicial proceedings against the defendant." *United States v. Gouveia*, 467 U.S. 180, 187 (1984). "[T]he right to counsel does not attach immediately after arrest and prior to arraignment." *United States v. Alvarado*, 440 F.3d 191, 199-200 (4th Cir. 2006) (*citing United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir.

---

defendant's statements can be used against the defendant in court, thereby misleading [the defendant]." *Id.*

    Giddins cites *Lall* to support the notion that when police tell a defendant he is not in trouble, any subsequent *Miranda* waiver may be involuntary. He cites *Beale* to support the notion that *Miranda* warnings must not be misleading. ECF No. 32 at 4-5.

    Besides not being controlling authority, *Lall* and *Beale* are distinguishable. Here, Detective Taylor did not promise Giddins that he would not pursue charges against him in exchange for Giddins's statement and did not state that Giddins was not in *any* trouble. Giddins was advised that anything he said may be used against him. Interview Tr. at 9. When Giddins asked if he was in trouble, Detective Taylor responded, "Not at this point, no. We'll find out what's going on. So long as you don't . . . sit there and tell me you were hiding in the trunk and you escaped when the police pulled them over, no." *Id.* at 11. Detective Taylor essentially told Giddins he was not in trouble provided he had not done anything wrong, thus leaving open the possibility that if Giddins had participated in the robberies, he may be "in trouble," and his statements may be used against him.

17

1994) (denying motion to suppress statements made after formal charging but prior to arraignment)).

Here, Giddins's Sixth Amendment right to counsel had not attached when he was questioned by police. Thus, no Sixth Amendment violation occurred. Accordingly, the Court will deny Giddins's motion to suppress custodial statements.

B.  Motion to Suppress Historical Cell Site Location Data

Giddins contends that the government's warrantless gathering of cell site location data violated Giddins's Fourth Amendment right to privacy. ECF No. 20 ¶ 3.[14] Giddins further contends that the Fourth Amendment violation is not saved by the government's "good faith reliance" on a federal statute. *Id.* ¶ 4. The government contends that Giddins had no privacy interest in his cell site location records because they were business records held by a third party. ECF No. 23 at 4. The government also contends that the "good faith reliance" exception applies. *Id.* at 9.

---

[14] In Giddins's (withdrawn) motion to suppress tangible and derivative evidence, Giddins also argues that 18 U.S.C. § 2703(c) does not, by its terms, authorize disclosure of cell site location data. ECF No. 18 ¶ 11. Thus, Giddins does not apparently argue that § 2703(c) is facially unconstitutional, but that, as applied here, Giddins's Fourth Amendment rights were violated when the government used § 2703(c) to obtain his cell site location data without a warrant.

1.    Privacy Interest

The government obtained the court order under the Stored

Communications Act ("SCA"), 18 U.S.C. §§ 2703(c) and (d).

Section 2703(c) provides, *inter alia*:

> (c) Records concerning electronic communication
> service or remote computing service.--
> (1) A governmental entity may require a provider of
> electronic communication service or remote computing
> service to disclose a record or other information
> pertaining to a subscriber to or customer of such
> service (not including the contents of communications)
> only when the governmental entity--
>> (A) obtains a warrant issued using the procedures
>> described in the Federal Rules of Criminal
>> Procedure . . . by a court of competent
>> jurisdiction;
>> (B) obtains a court order for such disclosure
>> under subsection (d) of this section; [or]
>> (C) has the consent of the subscriber or customer
>> to such disclosure; . . . .

18 U.S.C. § 2703(c)(1) (2012).  Section 2703(d) provides,

*inter alia*:

> (d) Requirements for court order.--A court order for
> disclosure under subsection (b) or (c) may be issued
> by any court that is a court of competent jurisdiction
> and shall issue only if the governmental entity offers
> *specific and articulable facts showing that there are*
> *reasonable grounds to believe* that the contents of a
> wire or electronic communication, or the records or
> other information sought, are relevant and material to
> an ongoing criminal investigation. . . .

*Id.* § 2703(d) (emphasis added).

Giddins cites the U.S. Supreme Court's recent decision in

*Riley v. California*, 134 S. Ct. 2473 (2014), as support for his

contention that obtaining cell site location data without a warrant violates the Fourth Amendment.   ECF No. 20 ¶ 3.

In *Riley*, the Court stated that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse," and held that police must obtain a search warrant before searching a cellphone's contents, 134 S. Ct. at 2485, 2488.  Although the Court noted that "[h]istoric location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute," *id*. at 2490 (*citing United States v. Jones*, 132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring), this observation was made in the context of data stored *on* a person's cellphone, *id*. ("Data on a cellphone can also reveal where a person has been.").

*Riley* did not address the constitutionality of using 18 U.S.C. § 2703(d) to obtain historical cell site location data from third-party cellphone providers when there are "specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation." *Riley* does not resolve the issue.

The Fourth Circuit Court of Appeals has not addressed whether aggregated GPS surveillance implicates the Fourth Amendment warrant requirement.  In *United States v. Graham*, 846

20

F. Supp. 2d 384 (D. Md. 2012),[15] Judge Bennett affirmed the government's use of a court order under § 2703(d) to acquire cell site location data without probable cause.

Because the collection of data did not involve physical trespass to private property, *Graham* analyzed the gathering of cell site location data under *Katz v. United States*, 389 U.S. 347 (1967). *See Graham,* 846 F. Supp. 2d at 396 (*citing United States v. Jones*, 132 S. Ct. 945, 953 (2012) (Scalia, J.) ("Situations involving merely the transmission of electronic signals without trespass would remain subject to *Katz* analysis."). In deciding that the defendant did not have a legitimate expectation of privacy in his cell site location data, *Graham* relied on the business records/third-party doctrine explained by the U.S. Supreme Court in *United States v. Miller*, 425 U.S. 435, 443 (1976) and *Smith v. Maryland*, 442 U.S. 735 (1979). *Id.* at 403.

i.     *United States v. Miller*

As the U.S. Supreme Court has repeatedly held,

the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

---

[15] *Graham* is on appeal to the Fourth Circuit, where it has been pending for almost two years. *See United States v. Herevia*, No. RDB-13-639, 2014 WL 4784321, at *8 n.8 (D. Md. September 23, 2014).

*Miller*, 425 U.S. at 443 (*citing United States v. White*, 401 U.S. 745 (1971), *Hoffa v. United States*, 385 U.S. at 302 (1966), and *Lopez v. United States*, 373 U.S. 427 (1963)).

In *Miller*, the Court held that the defendant, Mitch Miller, did not have a protected privacy interest in business records kept by a bank about accounts in his name.  *Id.* at 440.  They were not Miller's "private papers," but were records maintained by the bank.  *Id.*

Miller argued that the bank records implicated the Fourth Amendment because they were copies of his personal records--checks and deposit slips--that he made available to the bank. *Id.* at 442.  Rejecting this argument, the Court stated that the records "contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business."  *Id.*   Thus, the Court held, Miller did not have a reasonable expectation of privacy in the records.  *Id.*

       ii.   *Smith v. Maryland*

In *Smith*, the Court affirmed "that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *Smith*, 442 U.S. at 743-44 (no expectation of privacy in record of telephone numbers dialed). First, the Court noted that telephone users "must convey phone numbers to the telephone company," and that users know that the

"phone company has facilities for making permanent records of the numbers they dial." *Id.* at 742 (internal quotation marks omitted).

Most courts addressing this issue have relied on the business records/third-party doctrine to affirm the government's acquisition of cell site location data under § 2703(d)'s "specific and articulable facts" standard. *See Graham*, 846 F. Supp. 2d at 389 (collecting cases). Because cellphone users "voluntarily convey their cell site location data to their cellular providers, they relinquish any expectation of privacy over those records," and, therefore, obtaining those records without probable cause does not violate the Fourth Amendment. *Id.*

The Fifth Circuit, in the context of overturning a magistrate judge's denial of a court order under § 2703(d), held that "[c]ell site data are business records." *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 615 (5th Cir. 2013). Provided "the [g]overnment meets the statutory requirements" of § 2703, the magistrate judge does not have discretion to deny the application. *Id.* Recognizing the need to balance privacy interests and technological change, the Court noted that "[a] legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way." *Id.* at 614 (*quoting*

*Jones*, 132 S. Ct. at 964) (Alito, J., concurring in the judgment). That is what Congress did when it enacted § 2703. *Id.*[16]

Some courts have held otherwise.[17] The Eleventh Circuit recently held that the collection of cell site location data violated the defendant's reasonable expectation of privacy. *United States v. Davis*, 754 F.3d 1205, 1215 (11th Cir. 2014) (no reversible error, however, under the good faith exception recognized in *United States v. Leon*, 468 U.S. 897, (1984)).

The Eleventh Circuit found instructive the U.S. Supreme Court's opinion in *Jones*. In distinguishing *Jones* in favor of the defendant, the Court explained:

> One's cell phone, unlike an automobile, can accompany its owner anywhere. Thus, the exposure of the cell site location information can convert what would otherwise be a private event into a public one. When one's whereabouts are not public, then one may have a

---

[16] *Cf. In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 317 (3d Cir. 2010) (overturning magistrate judge's denial of a § 2703(d) court order but stating that "[a] cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way" and that "it is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information").

[17] *See, e.g., In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info.*, 809 F. Supp. 2d 113, 126-27 (E.D.N.Y. 2011) (finding that the collection of cell site location data implicated the Fourth Amendment and denying government's application for a court order under § 2703(d) because it lacked probable cause).

> reasonable expectation of privacy in those
> whereabouts. Therefore, while it may be the case that
> even in light of the *Jones* opinion, GPS location
> information on an automobile would be protected only
> in the case of aggregated data, even one point of cell
> site location data can be within a reasonable
> expectation of privacy.

*Davis*, 754 F.3d at 1216.[18]  That opinion, however, has been

vacated pending rehearing *en banc*.  *United States v. Davis*, No.

12-12928, 2014 WL 4358411 (4th Cir. Sept. 4, 2014).

The Fourth Circuit has applied the business records/third-

party doctrine to affirm the issuance of administrative

subpoenas against a Fourth Amendment challenge.  *See United*

*States v. Bynum*, 604 F.3d 161 (4th Cir. 2010).  In *Bynum*, the

FBI served Yahoo!, Inc. ("Yahoo") an administrative subpoena

requesting subscriber information entered into the Yahoo website

and internet protocol ("IP") addresses associated with uploads

to the Yahoo website, 604 F.3d at 162-63.  Using information

provided by Yahoo, the FBI issued a subpoena to UUNET

Technologies to obtain information on the customer associated

---

[18] *But see Graham*, 846 F. Supp. 2d at 403 (noting that the GPS
surveillance in *Jones* was conducted without a warrant).  *Graham*
quoted from Justice Sotomayor's concurring opinion in *Jones*: "I
would also consider the appropriateness of entrusting to the
Executive, in the absence of any oversight from a coordinate
branch, a tool [GPS tracking] so amenable to misuse, especially
in light of the Fourth Amendment's goal to curb arbitrary
exercises of police power and prevent a too permeating police
surveillance."  *Graham*, 846 F. Supp. 2d at 403 (*quoting Jones*,
132 S. Ct. at 956 (Sotomayor, J., concurring) (internal
quotation marks omitted)).

with the IP address. *Id.* From there, the FBI subpoenaed records from telephone and internet companies operating the defendant's dial-up internet service. *Id.* Those companies provided the FBI with the defendant's name and physical address. *Id.*

The Fourth Circuit held that the defendant did not have a subjective expectation of privacy in internet and telephone subscriber information because he voluntarily conveyed that information to third-parties. *Id.* at 164. Even if he did, "such an expectation would not be objectively reasonable." *Id.* "Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation." *Id.* (*quoting United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008) (collecting cases)).

Here, the records were not Giddins's "private papers," but were business records made and maintained by Sprint. Giddins voluntarily transmitted a signal to a cell tower upon making a call or sending a text message. Although one may argue that a cellphone user, like Giddins, receiving a call or text message "hasn't voluntarily exposed anything at all," *Davis*, 754 F.3d at 1217, Giddins relied on the signal transmission *from* the cell tower to pick up the call (or text message). Transmission information was used by Sprint to generate its location data,

and, thus, the records at issue here were Sprint's business records.

In light of U.S. Supreme Court precedent, and the application of the business records/third-party doctrine by the Fourth Circuit, the Court finds that Giddins's Fourth Amendment rights were not violated when the government obtained his cell site location data pursuant to a court order under § 2703(d).

Further, although the government is not required to obtain a warrant supported by probable cause, the government must, at a minimum, support its application with "specific and articulable facts showing that there are reasonable grounds to believe that the . . . records or other information sought, are relevant and material to an ongoing criminal investigation." § 2703(d). Congress has determined the appropriate balance to be struck. "[I]f the arc of technological improvement (or the implementation of that technology by the government) should be altered in a way that does infringe a person's legitimate expectation of privacy, the solution is properly for the legislature to address." *Graham*, 846 F. Supp. 2d at 390.

    2.   Good Faith Reliance

When a Fourth Amendment violation occurs, suppression of evidence is not automatic. The purpose of the exclusionary rule is to deter law enforcement from violating the Fourth Amendment. *Illinois v. Krull*, 480 U.S. 340, 349 (1987). "The application of

27

the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have . . . little deterrent effect." *Id.* When "the officer's conduct is objectively reasonable, . . . '[e]xcluding the evidence will not further the ends of the exclusionary rule in any appreciable way.'" *Id.* (*quoting United States v. Leon*, 468 U.S. 897, 920 (1984)).

Here, it was objectively reasonable for investigators to rely on § 2703(d) to obtain Sprint's records. Section 2703(c)(1) requires a provider to disclose "a record or other information pertaining to a subscriber to or a customer of [its] service" when the government obtains a court order under § 2703(d). Cell site location data is "a record . . . pertaining to" Giddins, as a subscriber/customer of Sprint's services.

Accordingly, the officer's good faith reliance on a federal statute cures any Fourth Amendment violation that may have occurred. Accordingly, the Court will deny Giddins's motion to suppress historical cell site location data.

III. Conclusion

For the reasons stated above, the Court will deny Giddins's motions to suppress custodial statements and historical cell site location data.

_____9/30/14_____                    _____
Date                                      William D. Quarles, Jr.
                                          United States District Judge